COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| RAMON ENRIQUE MANZO, | | No. 08-08-00325-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | Criminal District Court No. 1 |
| | § | |
| THE STATE OF TEXAS, | | of El Paso County, Texas |
| | § | |
| Appellee. | | (TC # 20030D01620) |
| | § | |

**O P I N I O N**

Ramon Enrique Manzo was indicted for intentionally and knowingly possessing a usable quantity of marijuana, more than fifty pounds but 2,000 pounds or less. A jury found Appellant guilty as charged in the indictment. We affirm the conviction, but we vacate the sentence and remand for a new punishment hearing.

**FACTUAL BACKGROUND**

Deputy Sheriff Victor Donoso was called out to the Paso Del Norte port of entry on March 13, 2003 for a narcotics possession case. When he arrived, he was directed by customs inspectors to 91 bundles of marijuana. The bundles weighed 175.3 pounds. He took possession of the bundles, impounded a red Ford Mustang, and met with Appellant. Donoso advised Appellant of his rights, placed him under arrest, and transported him to the Montana substation. Donoso booked Appellant into jail and placed the marijuana in the evidence locker.

Customs and Border Protection Officer Ramiro Vega testified that while he patrolled with a K-9 officer, the dog starting pulling toward a red Mustang driven by Appellant. Vega asked Appellant what he was bringing from Mexico and Appellant responded that he was not bringing

anything. Vega asked one of the officers carrying a density meter to come over to the vehicle. Vega walked Appellant over to the headhouse where he was placed in a detention cell.

Meanwhile, Officer Maribel Terrazas ran the density meter along the bumper of the Mustang once she saw the dog. She received an abnormal reading on the density meter. Terrazas then began a visual inspection of the bumper and noticed that there was foam within the bumper and a gap between the foam and the metal box. She inserted a probe and extracted what appeared to be a green leafy substance. Terrazas then interviewed Appellant for basic biographical information. After Appellant gave Terrazas his name, he asked her if they had found any drugs in the vehicle. Terrazas asked for his date of birth, and again Appellant asked if they found drugs in the vehicle. As a matter of policy, drivers are not informed of investigations until special agents take custody and read them their rights. Appellant asked Terrazas a third time if they had found any drugs in the vehicle. Terrazas described his demeanor as very anxious, pacing back and forth, walking around, moving around, with his head looking down at the ground. Asked directly about his repeated inquiries, Appellant responded, "Because I saw the dog run around my car, so I know there must be drugs in the vehicle." Terrazas tested the green leafy substance to confirm that it was marijuana. On cross- examination, she admitted that she could not smell the odor or marijuana emanating from the vehicle.

Jose Luis Perez, a special agent with the Immigration and Customs Enforcement, took photographs of the vehicle to demonstrate exactly where the marijuana was located. He interviewed Appellant and gave him his *Miranda* warnings. Appellant explained that he had come with his mother to El Paso four days earlier. He had just purchased the Mustang for $4,000. He put his car in the shop for some radiator problems and they took about three days to fix it. Appellant blamed the people who fixed his car for putting the drugs in the car. But up to that point, Perez had not

informed Appellant why he was being detained. Perez asked him what repairs were done at the shop and Appellant responded that they replaced the radiator, the thermostat, and the belts. Perez then asked him how he thought the drugs got in his vehicle. At that point Appellant requested a lawyer and the interview was terminated. Perez inspected the vehicle and found no evidence of repairs, nor did he locate receipts for the work done. Only the vehicle registration was inside the car.

Perez became suspicious of the vehicle because the key chain only contained two keys--one for the ignition and one for the door. In his experience, the fact that Appellant only had two keys is an indication that the vehicle was just recently given to him for the purpose of transporting the vehicle. Perez corroborated previous testimony that the drug smugglers try to establish a pattern of crossing to lower suspicion and to take advantage of shift changes as the opportune time to cross cars. Appellant's vehicle had exactly three crossings all close to shift changes. Appellant crossed twice on March 12 and once on March 13 when he was detained. Perez testified that a pound of marijuana sells for between $225 to $250 in El Paso. Once the drugs head north or east, the value may increase substantially. Marijuana sells for close to $600 a pound in the Dallas/Fort Worth area. In Perez's experience, the transporters or "mules" that carry the drugs from Point A to Point B typically are aware that they possess the drugs because the owners of the drugs are not willing to risk their product on individual who is unaware.

During Appellant's case-in-chief, his mother testified that her son came to the El Paso/ Juarez area in March 2003 because she was having surgery on March 17. She admitted on cross-examination that as of the date of the trial, she had not yet had the surgery.

Appellant's girlfriend testified that she drove with Appellant from Fort Worth to Juarez in March and stayed with his mother for a week.

Appellant testified that he lived in Fort Worth and worked as a heating and cooling

technician, earning between $500 to $600 a week.  He began experiencing car trouble while visiting his mother in Juarez.  Appellant had his brother take his car to a mechanic.  The mechanic asked for $100 to replace the radiator, and Appellant paid $125 to replace a belt, the thermostat, and the water hose.  He got his car back three days later, on March 12.  He took his girlfriend shopping in El Paso and then later that same day returned to El Paso to buy beer and cigarettes because they stop selling beer at eight o'clock in Juarez.

While in Juarez, Appellant asked his cousin, Martha Rios, to wire him $200 by Western Union because he was running low on money and wanted to stay until March 17.  Appellant was stopped on his way to El Paso to pick up the money.  He was at his mother's home the whole time his car was at the shop and he never saw anyone put drugs in his car.

Appellant testified that while he was in line on the bridge, officers came by with a dog.  The dog began scratching at the bumper.  The officer opened the passenger door of the Mustang and let the dog inside the car.  The dog began scratching everywhere.  He told the officers at the bridge that he was set up because he knew there were drugs in his car by the behavior of the dogs.  He admitted that none of the officers had informed him that there were drugs in the car when he made that statement.

**SUFFICIENCY OF THE EVIDENCE**

In his first two Points of Error, Appellant challenges the legal and factual sufficiency of the evidence to support the conviction.

*Standard of Review*

In reviewing the legal sufficiency of evidence, we consider all evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979). We look at "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007), *quoting Cordova v. State*, 698 S.W.2d 107, 111 (Tex.Crim.App. 1985). We must account for "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper*, 214 S.W.3d at 13, *quoting Jackson*, 443 U.S. at 318-19, 99 S.Ct. 2181.

Appellate courts are constitutionally empowered to review the judgment of the trial court to determine the factual sufficiency of the evidence used to establish the elements of an offense. *Johnson v. State*, 23 S.W.3d 1, 6 (Tex.Crim.App. 2000), *citing Clewis v. State*, 922 S.W.2d 126, 129-30 (Tex.Crim.App. 1996). In examining the factual sufficiency of the elements of the offense, all evidence is viewed in a neutral light, favoring neither party. *Clewis*, 922 S.W.2d at 129. In performing our review, due deference is given to the fact finder's determinations. *See Johnson*, 23 S.W.3d at 8-9. Evidence may be factually insufficient if it is so weak that it would clearly be wrong and manifestly unjust for the verdict to stand, or "the adverse finding is against the great weight and preponderance of the available evidence." *Johnson*, 23 S.W.3d at 11. The question that must be

answered when reviewing factual sufficiency is whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or proof of guilt, although ample if taken alone, is greatly outweighed by contrary proof. *Id* .

Under the first prong of *Johnson*, we cannot conclude that a conviction is "clearly wrong" or "manifestly unjust" simply because, on the amount of evidence admitted, we would have voted to acquit had we been on the jury. *Watson v. State*, 204 S.W.3d 404, 417 (Tex.Crim.App. 2006). Under the second prong of *Johnson*, we cannot declare that a conflict in the evidence justifies a new trial simply because we disagree with the jury's resolution of the conflict. *Id*. In order to find that evidence is factually insufficient to support a verdict, we must be able to say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id*.

*Elements of the Offense*

To prove possession of marijuana, the State must necessarily prove that the accused exercised care, control, and management over the marijuana, and that he knew he was in possession of the contraband. *Martin v. State*, 753 S.W.2d 384, 386 (Tex.Crim.App. 1988). Possession involves more than simply being where the action is; it requires exercise of dominion and control over the thing allegedly possessed. *McGoldrick v. State*, 682 S.W.2d 573, 578 (Tex.Crim.App. 1985). Evidence must affirmatively link the accused to the contraband by evidence indicating knowledge and control. *Menchaca v. State*, 901 S.W.2d 640, 651 (Tex.App--El Paso 1995, pet. ref'd), *citing Waldon v. State*, 579 S.W.2d 499, 501 (Tex.Crim.App. 1979). The burden of establishing affirmative links rests upon the State. *Menchaca*, 901 S.W.2d at 651, *citing Damron v. State*, 570 S.W.2d 933, 935 (Tex.Crim.App. 1978). Proof of knowledge is an inference drawn by the jury from

all circumstances. *Dillon v. State*, 574 S.W.2d 92, 94 (Tex.Crim.App. 1978). Knowledge may arise from the conduct of and remarks by the accused or from circumstances surrounding the acts engaged in by the accused. *Sharpe v. State*, 881 S.W.2d 487 (Tex.App.--El Paso 1994, no pet.).

An affirmative link, which may be shown by either direct or circumstantial evidence, "must establish, to the requisite level of confidence, that the accused's connection with the drug was more than just fortuitous." *Brown v. State*, 911 S.W.2d 744, 747 (Tex.Crim.App. 1995). Factors that may affirmatively link the accused to contraband include whether: (1) the contraband was in plain view or recovered from an enclosed place; (2) the accused was the owner of the premises or the place where the contraband was found; (3) the accused was found with a large amount of cash; (4) the contraband was conveniently accessible to the accused; (5) the contraband was found in close proximity to the accused; (6) a strong residual odor of the contraband was present; (7) the accused possessed other contraband when arrested; (8) paraphernalia to use the contraband was in view, or found on the accused; (9) the physical condition of the accused indicated recent consumption of the contraband in question; (10) conduct by the accused indicated a consciousness of guilt; (11) the accused attempted to flee; (12) the accused made furtive gestures; (13) the accused had a special connection to the contraband; (14) the occupants of the premises gave conflicting statements about relevant matters; (15) the accused made incriminating statements connecting himself to the contraband; (16) the quantity of the contraband; and (17) the accused was observed in a suspicious area under suspicious circumstances. *Lassaint v. State*, 79 S.W.3d 736, 740-41 (Tex.App.--Corpus Christi 2002, no pet.). Any list of affirmative links is non-exclusive. *Castellano v. State*, 810 S.W.2d 800, 805 (Tex.App.--Austin 1991, no pet.). The logical force the factors play in establishing the elements of the offense is more important than the number of factors involved. *See Jones v. State*, 963 S.W.2d 826, 830 (Tex.App.--Texarkana 1998, pet. ref'd).

If evidence suggests that the accused has dominion or control over the vehicle in which the contraband is concealed, the accused may be in possession of the contraband. *Castellano*, 810 S.W.2d at 806. (finding that defendant exercised control over a car and possession of its contraband as a passenger when he instructed the driver to continue on the freeway and not exit). Knowledge of the presence of contraband may be inferred from control over the vehicle in which the contraband is concealed, particularly when the amount of contraband is large enough to indicate that the accused knew of its presence. *Castellano*, 810 S.W.2d at 806. When contraband is found in hidden compartments in a vehicle, the court should not rely solely upon control of the vehicle to show knowledge. *Id*. Additional factors indicating knowledge, such as circumstances indicating a consciousness of guilt, must be examined. *Id*.

In *Menchaca v. State*, we found the evidence sufficient to support the appellant's conviction for possession of marijuana. 901 S.W.2d 640, 652 (Tex.App.--El Paso 1995, pet. ref'd). Menchaca had attempted to cross through customs inspection at the Paso del Norte Bridge. *Id*. at 644. The customs inspector noticed that the vehicle had temporary license plates, that the key that operated the vehicle was the only one on the key chain, and that Menchaca appeared nervous because his hands were shaking and he avoided making eye contact. *Id*. Menchaca stated that he had borrowed the car from a friend and was taking it to Deming, New Mexico. *Id*. When the inspector opened the passenger side door, he observed a small cylindrical object wrapped in gray duct tape underneath the right front fender. *Id*. Through the aid of a trained canine, inspectors found 49.5 pounds of marijuana. *Id*. In our analysis, we focused on the fact that at trial, the jury was well aware that the cargo with which Menchaca had been entrusted was valuable. *Id*. at 652. The jury could have a made rationally inferred that Menchaca would not have been entrusted to carry the valuable cargo across an international border if he were unaware of it. *Id*.; *citing Castellano v. State*, 810 S.W.2d

800, 806 (Tex.App.--Austin 1991, no pet.)(finding similar inference rational). The fact that Menchaca appeared nervous and had difficulty opening the trunk because his hands were shaking also may have allowed the jury to rationally infer that knowledge of the contraband caused his nervousness. *Id*. at 652. Based on the evidence, we concluded that the evidence was sufficient. *Id*.

In *Delgado v. State*, the appellant challenged the legal and factual sufficiency of the evidence to sustain his conviction for possession of marijuana. 2009 WL 497740, at *2 (Tex.App.--El Paso, 2009, no pet.)(not designated for publication). We found that Delgado exercised control over the vehicle and its contraband because he was the driver and sole occupant. *Id*. at *4. The affirmative links connecting him to the contraband included: (1) the quantity and location of the contraband; (2) conduct during his interaction with the officer; and (3) a notebook, considered to be a "drug ledger," found in the vehicle. *Id*. The officer found the marijuana in a hidden compartment and the officer testified that Delgado became nervous when he was given the reason for the stop. *Id*. His hands were shaking and he began to stutter as he talked. *Id*. The evidence was not insufficient despite the fact that he did not make any incriminating statements, did not have a large amount of cash on him, and did not attempt to flee. *Id*.

Here, the State relies on mostly circumstantial evidence to show an affirmative link between Appellant and the contraband. The affirmative links supported by the evidence are: (1) Appellant owned the Mustang carrying the marijuana; (2) his conduct indicated a consciousness of guilt; (3) the quantity of the contraband; and (4) he was observed in a suspicious place under suspicious circumstances. It is undisputed that Appellant is the owner, driver, and sole occupant of the Mustang where the marijuana was found. Knowledge of the presence of contraband may be inferred from control over the vehicle in which the contraband is concealed, particularly when the amount of contraband is large enough to indicate that the accused knew of its presence. *See Castellano*, 810

S.W.2d at 806. But we will not rely solely upon control of the vehicle since the contraband was found in hidden compartments. Additional factors indicating knowledge, such as circumstances indicating a consciousness of guilt, must be examined.

Officer Terrazas described Appellant as very anxious, pacing back and forth, walking around, moving around, with his head looking down at the ground. He repeatedly asked Terrazas whether the inspectors found drugs in his car. Appellant blamed the men who fixed his car for putting the drugs there before Perez informed him why he was being interviewed. Appellant also admitted that when the officers and K-9 began to approach his car, he blurted out that the smell came from a skunk he hit on the road. Based on Appellant's behavior and comments, a jury could have rationally inferred that Appellant displayed a consciousness of guilt.

We turn next to the quantity of the contraband. The Mustang contained 175.3 pounds of marijuana with an approximate value of $40,000 to $100,000 depending on its final destination. Agent Perez testified that the marijuana would be worth significantly more if Appellant were to take the marijuana to the Dallas/Fort Worth area. The amount of marijuana supports an inference that Appellant had knowledge of its existence. *See Menchaca*, 901 S.W.2d at 652 (holding that the jury was well aware that the cargo with which the defendant had been entrusted was valuable and that it was a rational inference that the defendant would not have been entrusted in taking the valuable cargo across an international border if he were a mere innocent, ignorant of all the details surrounding his responsibility and the importance of the cargo in his care).

The testimony also demonstrates that Appellant was observed in a suspicious place under suspicious circumstances. Agent Perez testified that Appellant's keys and crossing history were consistent with drug trafficking. Drug traffickers have a habit of "burning" the license plates into the inspection station's computers to establish a crossing history. If a vehicle has a history of

crossing, it is less likely to draw suspicion. Appellant crossed the bridge twice the day before his arrest. The jury may have inferred that Appellant was attempting to "burn" his plates. He also crossed during or near shift changes. The circumstances of Appellant's crossing helped create an affirmative link between him and the marijuana found in his vehicle.

Viewing the evidence in a favorable light towards the verdict, we conclude it is legally sufficient to enable a rational jury to conclude that Appellant exercised care, control, custody, or management over the marijuana and that he knew he was in possession of the marijuana. We overrule Point of Error One. Viewing the evidence in a neutral light, we likewise find the evidence factually sufficient to support the verdict. The jury was free to disbelieve Appellant's theories and explanations of how the marijuana ended up in his vehicle. *See Johnson*, 23 S.W.3d at 8-9. The jury was also free to disbelieve Appellant's explanations to the circumstances surrounding his crossing. Given the evidence affirmatively linking Appellant to the marijuana, the contrary evidence was not so strong that the verdict was against the great weight and preponderance of the evidence. We overrule Point of Error Two.

### REVOCATION OF APPEAL BOND

In Point of Error Three, Appellant argues the trial court erred when the judge revoked his probation, for invalid reasons, and illegally sentenced him to serve time in prison without his attorney being present to defend him in violation of his Due Process rights under the United States Constitution and the Texas Constitution.

We agree with the State that Appellant's complaint about the revocation of his probation is without merit because Appellant was never actually on probation. However, we construe Appellant's complaint on appeal as challenging the revocation of his appeal bond and subsequent re-sentencing. With regard to the appeal bond, we first analyze whether Appellant was entitled to

an appeal bond in the first place. Then we must to look to the record in order to find whether Appellant's counsel was present and given a chance to defend against the revocation. Finally, we address the order sentencing Appellant to ten years' confinement.

*Relevant Facts*

Prior to the punishment phase of trial, Appellant and the State agreed to sentence Appellant to ten years' shock probation. The court gave Appellant ten days to take care of his affairs in Fort Worth before he turned himself in to the El Paso County Jail. The court pronounced the sentence as confinement in prison for a period of ten years, but suspended the sentence and placed Appellant on adult probation for a period of ten years under terms and conditions which included shock probation. Shock probation means that after six months in the Texas Department of Corrections, depending on his behavior, Appellant would be re-sentenced to straight probation.

Appellant filed a motion for new trial which was overruled in its entirety. At the hearing, the court also heard an oral motion for an appeal bond. The court took judicial notice that Appellant was sentenced to ten years in prison and the appeal bond was set at $5,000 conditioned upon a diligent prosecution of an appeal.

On March 7, 2007, the court held a post-conviction hearing. Neither Appellant nor his counsel were present. The court revoked the appeal bond after it was brought to the court's attention that Appellant had not filed a notice of appeal. The court stated it would issue a judgment nisi and a capias for Appellant's arrest. A status conference was held on March 19. Before defense counsel arrived, the court informed Appellant that it would revoke the appeal bond and order him into custody. Attorney Sergio Gonzalez arrived and advised the court that he had filed a notice of appeal. The court did not find it in the record and asked counsel for proof of filing. Gonzalez asked the court if his secretary could fax something over.

On March 21, Appellant filed his request for permission to appeal. At the hearing, counsel explained that the appeal was untimely filed due an internal office error. The trial court ruled that it no longer had authority to act. On April 30, 2007, Appellant was resentenced to the penitentiary for ten years. The order stated that (1) Appellant served sixty days or more under the provisions of Article 42.12(e)(a); (2) he had received unsatisfactory marks from Boot Camp; and (3) the Community Supervision Department recommended that Appellant not be placed back on community supervision. On May 31, 2007, the court filed an order nunc pro tunc changing the word "Boot Camp" to "Shock."

On October 1, 2007, Appellant filed a *pro se* motion requesting to be released on probation. On December 17, he filed a *pro se* motion for reconsideration of his request for shock probation. On March 29, 2008, he filed a *pro se* application for Article 11.07 post-conviction writ of habeas corpus, claiming that he was denied effective assistance of counsel due to Gonzalez's failure to timely file notice of appeal. The trial court agreed and the Court of Criminal Appeals ultimately granted Appellant's request for an out-of-time appeal.

### *Article 44.04(b)*

A defendant may not be released on bail pending an appeal from a felony conviction where the punishment "equals or exceeds ten years confinement." TEX.CODE CRIM.PROC.ANN. art. 44.04(b)(Vernon 2006). In *Lebo v. State*, the Court of Criminal Appeals interpreted Article 44.04(b) to mean that "those who are sentenced to ten years' actual imprisonment are not entitled to bail pending appeal, while those who are placed on ten years' [probation] may seek release on bail pending appeal." 90 S.W.3d 324, 330 (Tex.Crim.App. 2002). "[A]rticle 44.04(b) prohibits the setting of bail pending appeal only when the sentence of imprisonment is actually imposed and the defendant would, had he not appealed, be immediately incarcerated to serve his term of

imprisonment." *Id*. at 326.

Here, the parties reached an agreement as to ten years' confinement pursuant to the shock-probation provisions of Section 6, art. 42.12. The trial court explained that shock probation meant that Appellant would be ordered to prison for a period of ten years, but within six months, would be brought back to determine his progress and, if he is doing well, then he will be placed on probation. Therefore, Appellant's ten year prison sentence was actually imposed and he was not entitled to an appeal bond. *See* TEX.CODE CRIM.PROC.ANN. art. 44.04(b).

*Sixth Amendment Right*

Appellant's contention that the court revoked his probation in the absence of his attorney is not supported by the record. Although the record shows that Appellant's attorney was not present initially, upon his arrival, he was given an opportunity to present evidence to the court as to why the bond should not be revoked. Counsel was present when the order to revoke the bond was entered.

*Resentence*

To the extent that Appellant challenges the court's revocation of the appeal bond, we overrule his issues on appeal. However, we agree with the State that Appellant was nevertheless denied the benefit of his post-verdict, bargained for opportunity for shock probation. In essence, Appellant's plea to an agreed punishment was rendered involuntary.

In its brief, the State asks that in the interest of justice, we vacate Appellant's sentence and remand the case to the trial court for a new punishment hearing. The State first concedes that although Appellant's agreed punishment is not a true plea bargain, if the shock probation sentence had been a part of a true plea bargain, the failure to afford Appellant the benefit of his bargain would render the plea involuntary. It also concedes that since 180 days has passed since Appellant began serving his sentence, the trial court lost jurisdiction to suspend further execution of the sentence and place Appellant on probation, as contemplated by the shock-probation statute. *See* TEX.CODE CRIM.PROC.ANN. art. 42.12, § 6 (Vernon 2006). We agree with the State and sustain Point of Error Three in part. In the interest of justice, we vacate Appellant's sentence and remand to the trial court for a new punishment hearing.

June 30, 2010

ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Rivera, JJ.

(Do Not Publish)