COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

EUGENE NIXON,                                               )

                                                                              )              
No.  08-02-00323-CR

Appellant,                          )

                                                                              )                    Appeal from the

v.                                                                           )

                                                                              )         
168th District Impact Court

THE STATE OF TEXAS,                                     )

                                                                              )           
of El Paso County, Texas

Appellee.                           )

                                                                              )              
(TC# 20010D04387)

                                                                              )

 

 

O
P I N I O N

 

Appellant Eugene
Nixon appeals his conviction for possession of a controlled substance, to
wit:  cocaine, having an aggregate
weight, including adulterants or dilutants, of 400 grams or more.  Appellant was tried with codefendant Alma
Montes.  The jury found Appellant guilty
of the charged offense and assessed punishment at 15 years= imprisonment in the Institutional
Division of the Texas Department of Criminal Justice and a fine of $5,000.  On appeal, Appellant challenges the legal and
factual sufficiency of the evidence to sustain his conviction.  We affirm.








On August 20,
2001, Officer Edgar Baca was on duty as a security officer at the El Paso
County Jail.  Officer Baca was working at
the main entrance of the building in the second security booth where visitors= permit information is verified.  Officer Baca=s
station was past the information booth and the metal detector.  Officer Baca observed an older gentlemen and
young lady, later identified as Appellant and codefendant Alma Montes, come
through his security checkpoint.  Ms.
Montes passed through the metal detector first. 
Officer Baca noticed that she hesitated and stopped a little past the
security desk and did not proceed to the elevators.

Appellant was
standing in front of the metal detector and Officer Baca told him to pass
through the machine.  Appellant set off
the metal detector when he passed through it. 
Appellant was carrying a nylon portfolio and Officer Baca asked him what
was in it.  Appellant told Officer Baca
that it contained legal papers.  Officer
Baca suggested that an officer could take the paperwork upstairs to be signed.  He told Appellant to open the portfolio so he
could see the contents.  Appellant
hesitated before handing it over. 
Officer Baca told Appellant just to open up the portfolio and the
officer looked inside it.  Inside was a
black box a bit larger than a video cassette. 
There was nothing else inside the portfolio.  Officer Baca asked Appellant what the object
was and Appellant replied, AI
don=t know.@  Officer Baca also asked Ms. Montes but she
also did not know.  Ms. Montes told
Officer Baca the box was not hers.

Appellant and Ms.
Montes were detained while Officer Baca contacted Lieutenant Joe Chairez and
Deputies Conner and Lovato.  The officers
initially thought the item was some kind of narcotics, but became concerned
that the box or bundle, which Deputy Conner described as a square-shaped item
wrapped in black electrical tape, was an explosive device and transferred it to
a table near the lieutenant=s
office.  Appellant and Ms. Montes were
moved away from the public.








Appellant and Ms.
Montes were separated and Lieutenant Chairez interviewed them at different
times.  When Lieutenant Chairez could not
determine the contents of the package, he called Captain Gilbert Pinon who told
him to contact the Criminal Investigation Division (ACID@). 
Lieutenant Chairez then spoke with Sergeant Scott Mann at CID, who
instructed him to act as if the package held explosives and to secure and
evacuate the first floor of the building. 
Sergeant Mann contacted the military police for the bomb unit.  The bomb unit x-rayed the package, but no
electrical wires were observed.  After
another x-ray was taken, the officers determined that the package did not
appear to be a bomb.  Lieutenant Chairez
requested that the bomb unit open the package. 
The package was found to contain a yellowish-white powdery
substance.  The substance field-tested
positive for cocaine.  The total gross
weight of the cocaine was 1,080.6 grams. 
Upon further analysis Criminalist Ann Marie Falknor determined that the
net weight of the cocaine was 987.97 grams with a purity of 65 percent.

On August 21,
Detective Marcela Gil of the Metro Narcotics Task Force Unit in the Sheriff=s Department was assigned to the
case.  When Detective Gil interviewed Ms.
Montes, she told the detective that she had received an anonymous call from a
man instructing her to meet him around five in the afternoon at a nearby Furr=s if she did not want any harm to come
to her husband, who was in jail at the time. 
Ms. Montes drove to Furr=s
in her truck, parked by the pay phone, and was approached by an Anglo male on
the passenger side.  Ms. Montes told
Detective Gil that the man entered her vehicle and placed a black portfolio
underneath her seat.  The man repeated
his threat and instructed her to drive to a location, which was Appellant=s address.  The man exited her vehicle and Ms. Montes
drove to Appellant=s apartment.  Ms. Montes delivered the portfolio to
Appellant, who she claimed she did not know. 
When Ms. Montes told Appellant she was going to visit her husband in
jail, Appellant invited himself along and took the portfolio with him.  Ms. Montes indicated to Detective Gil that
she knew there was some type of narcotics in the portfolio and that she knew
and expected to be arrested at the jail.








As part of
Detective Gil=s
investigation, Ms. Montes=s
truck was taken into custody.  It was
parked in a nearby lot about a block from the jail.  Detective Gil asked Deputy Luis Almonte to
bring his K-9, Blackjack, to sniff search the vehicle.  Blackjack alerted to the bottom of the driver=s side seat and the vehicle was then
transported to the Task Force impound lot. 
No narcotics were found inside the vehicle, but Deputy Almonte testified
that the dog=s alert
signal indicated to him that at one time there had been a narcotic inside the
vehicle.

Appellant
testified he had been living in El Paso for just over a year.  Appellant stated that he had met Ms. Montes
and her husband a month or two earlier at a ball game.  They talked for about twenty minutes and then
he went on his way.  He met Ms. Montes
for the second time on August 16 when she knocked on his apartment door and
asked if he remembered her from the ballpark. 
He told her he did and let her into the apartment.  After exchanging pleasantries,
Ms. Montes informed Appellant that her husband was incarcerated and had
told her to go to Appellant and ask for his help in getting him out of jail.  Ms. Montes asked Appellant to contact her
husband=s
attorney.  Appellant called the attorney=s office twice, but never spoke with
him.








On August 20, Ms.
Montes came to his apartment again.  Ms.
Montes told Appellant that her husband had called and that they made a deal to
get him out of jail.  Ms. Montes could
not provide satisfactory information about the deal, so Appellant suggested
that she go down to the jail to talk to her husband.  Initially, Ms. Montes asked Appellant to go
to the jail, but he told her that she would have to go with him because he did
not have transportation.  When Appellant
got into the truck, he saw a black bag sitting between the seats.  Ms. Montes parked the truck a block down the
street from the jail and asked him to carry the black bag since she was
carrying her purse.  Appellant asked her
what was in the bag and she told him it contained the papers to get her husband
out of jail.  Appellant took the bag and
they went inside the jail.  Ms. Montes
and Appellant got in line.  He tried to
give her back the bag, but she said she had to go check her purse.  When she returned, he tried to give her the
bag again, but she left again to sign them in for visitation.  When she returned, Appellant followed Ms.
Montes through the visitation check-in station and on to the security
station.  When Appellant entered the
security station, the officer asked him what was in the bag.  Appellant told him about the papers but the
officer said he would have to inspect the bag. 
When Appellant opened the bag, he was surprised to find no papers in it
and instead it contained a black bundle.

On
cross-examination, Appellant denied owning the portfolio.  Appellant thought that it contained papers
and had no reason to believe Ms. Montes was lying.  Appellant disagreed with Officer Baca=s impression that he became nervous
when the metal detector went off.

Defense counsel
introduced into evidence a written statement Appellant gave to the police on
the day of his arrest.  In his statement,
Appellant stated that when the officer questioned Ms. Montes about the bag, she
told him that it was not Appellant=s.  Appellant denied knowing what was inside the
bag.  Appellant believed that Ms. Montes
knew what was in the bag because he noticed that she kept trying to distance
herself from it while they were at the jail.








Codefendant Alma
Montes also testified at the trial. 
According to Ms. Montes, she received a phone call from Appellant on
August 20.  Appellant told her his name
and said he had legal papers that could help her husband, but she had to go
pick him up because he did not have transportation.  Appellant gave her the address to his
apartment.  Ms. Montes did not know
Appellant, but she went to his apartment because she believed she could trust
him based on her husband=s
word.  She waited at the door while he
grabbed a package from inside his apartment that purportedly contained the
legal papers.  Upon entering her truck,
Appellant put the package on the left side of the floor board.

While waiting in
line at the jail, Ms. Montes realized she still had her purse with her.  She told Appellant that they were not allowed
to take anything inside and asked him whether he wanted her to take the package
back to her truck as well.  Appellant
said no, that he had legal papers in the package.  After passing through the metal detector, Ms.
Montes stopped to pick up her keys and driver=s
license from the basket.  Appellant then
passed through and set off the metal detector. 
Ms. Montes heard Appellant say Ashe=s with me,@
and the officer told her to stop.  When
asked what was in the package, Ms. Montes told the officer it contained legal
papers, but she had never seen the inside of the package.  Ms. Montes knew she was going to be arrested
when they were stopped at the metal detector because when they entered the
jail, Appellant mentioned to her that the package could get them into a lot of
trouble.  Ms. Montes did not leave when
Appellant told her this because at that point she was already inside the jail
and the officer told her to go in.  She
also stayed in line because she wanted to visit her husband.  It did not occur to her to mention Appellant=s statement to the officers.

Contrary to
Lieutenant Chairez=s
testimony, Ms. Montes claimed that she and Appellant were left alone together
in a room for a few minutes before they were separated for questioning.  At that time, Appellant threatened her
husband and told her to take the blame for the package.  Ms. Montes was afraid to tell the officers
about the threat.  During questioning,
Ms. Montes made up the story Detective Gil told in her testimony, except Ms.
Montes said she told the story to a different detective.

 








DISCUSSION

Sufficiency
of the Evidence

In two issues,
Appellant challenges the legal and factual sufficiency of the evidence to
sustain his conviction for possession of over 400 grams of cocaine.  Specifically, Appellant asserts the State
failed to prove beyond a reasonable doubt that he had knowledge that cocaine
was inside the portfolio that he carried into the county jail.

Standards
of Review

In reviewing the
legal sufficiency of the evidence, we must view the evidence in the light most
favorable to the verdict to determine whether any rational trier of fact could
have found the essential elements of the offense beyond a reasonable
doubt.  Jackson v. Virginia, 443
U.S. 307, 319, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979); Lacour v.
State, 8 S.W.3d 670, 671 (Tex.Crim.App. 2000).  We do not resolve any conflict of fact, weigh
any evidence, or evaluate the credibility of any witnesses, as this was the
function of the trier of fact.  See
Adelman v. State, 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); Matson v.
State, 819 S.W.2d 839, 843 (Tex.Crim.App. 1991); Lucero v. State,
915 S.W.2d 612, 614 (Tex.App.--El Paso 1996, pet. ref=d).  Instead, our duty is to determine whether if
both the explicit and implicit findings of the trier of fact are rational by
viewing all the evidence admitted at trial in the light most favorable to the
verdict.  See Adelman, 828 S.W.2d
at 421-22.  In so doing, any
inconsistencies in the evidence are resolved in favor of the verdict.  Matson, 819 S.W.2d at 843.








In conducting a
review of the factual sufficiency of the evidence, we view all the evidence in
a neutral light, both for and against the verdict, to determine whether it
demonstrates that the proof of guilt is so obviously weak as to undermine our
confidence in the jury=s
determination, or the proof of guilt, although adequate if taken alone, is
greatly outweighed by contrary proof.  Johnson
v. State, 23 S.W.3d 1, 11 (Tex.Crim.App. 2000); Clewis v. State, 922
S.W.2d 126, 134 (Tex.Crim.App. 1996).  We
review the evidence supporting a fact in dispute and compare it to evidence
tending to disprove that fact.  Johnson,
23 S.W.3d at 6-7; Jones v. State, 944 S.W.2d 642, 647 (Tex.Crim.App.
1996), cert. denied, 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54
(1997).  Although we are authorized to
set aside the jury=s
determination, we must give appropriate deference its determination and should
not intrude upon the jury=s
role as the sole judge of the weight and credibility given to evidence
presented at trial.  See Johnson,
23 S.W.3d at 7.  We will set aside a
verdict only where the evidence supporting guilt is so obviously weak or the
contrary evidence so overwhelmingly outweighs the supporting evidence as to
render the conviction clearly wrong and manifestly unjust.  Ortiz v. State, 93 S.W.3d 79,87
(Tex.Crim.App. 2002), cert. denied, 123 S.Ct. 1901, 155 L.Ed.2d 824
(2003).  A jury=s
verdict is not manifestly unjust merely because the fact finder resolved
conflicting views of the evidence in favor of the State.  Cain v. State, 958 S.W.2d 404, 410
(Tex.Crim.App. 1997).

Possession
of a Controlled Substance








In cases involving
possession of a controlled substance, the State must prove beyond a reasonable
doubt that the accused:  (1) exercised
care, custody, control or management over the contraband; and (2) knew the substance
he possessed was contraband.  See Tex.Health & Safety Code Ann. '' 481.115(a), 481.002(38)(Vernon
2003 & Vernon Supp. 2004); see also Brown v. State, 911 S.W.2d 744,
747 (Tex.Crim.App. 1995); Menchaca v. State, 901 S.W.2d 640, 651
(Tex.App.--El Paso 1995, pet. ref=d).  An affirmative link must be established
between the accused and the contraband, demonstrating both that the accused had
control over it and had knowledge of its existence and character.  See Brown, 911 S.W.2d at 747; Menchaca,
901 S.W.2d at 651. Knowledge can be inferred from the conduct of and remarks by
the accused and from circumstances surrounding the acts engaged in by the
accused.  Menchaca, 901 S.W.2d at
652.

In this case,
Appellant entered the county jail with a black portfolio.  Appellant was carrying the portfolio when he
passed through the metal detector. 
Officer Baca observed Appellant with the portfolio and asked Appellant
what it contained.  Appellant told
Officer Baca that it contained legal papers, but the portfolio was found to
contain a black bundle, which officers later determined contained cocaine with
a total gross weight of 1,080.6 grams. 
The contraband was found in Appellant=s
exclusive physical possession.  According
to Ms. Montes, Appellant warned her that the package he was carrying could get
them in a lot of trouble and later threatened to harm her husband if she did
not take the blame.  Based on this
evidence the jury could reasonably infer that Appellant had control over the
contraband and had knowledge of its existence and character.  While Appellant offered contrary testimony as
to who owned the portfolio, the jury as trier of fact and sole judge of the
credibility of the witnesses was free to accept or reject all or part of his or
other witnesses=
testimony.  See Jones, 944 S.W.2d
at 647.  After reviewing all the evidence
in a neutral light, we conclude the evidence supporting guilt is not so
obviously weak nor overwhelmingly outweighed by contrary proof as to render the
conviction clearly wrong and manifestly unjust. 
Therefore, we conclude the evidence is both legally and factually
sufficient for the jury to find, beyond a reasonable doubt, that Appellant
knowingly and intentionally possessed 400 grams or more of cocaine.  Issues One and Two are overruled.








Accordingly, we
affirm the trial court=s
judgment.

 

 

 

July
22, 2004

DAVID WELLINGTON
CHEW, Justice

 

Before Panel No. 1

Larsen, McClure, and Chew, JJ.

 

(Do Not Publish)